UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM J. BRENNAN, | Civ. No. 11-6101 (KM)(MCA) |
| Plaintiff, | OPINION |
| v. | |
| WILLIAM PATERSON COLLEGE; TOWNSHIP OF WAYNE; BRIAN GORSKI; SANDRA L. MILLER; JOHN DOES 1-5, and JOHN DOES 1-10, | |
| Defendants. | |

**MCNULTY, U.S.D.J.:**

    The Plaintiff, William J. Brennan, brings this suit against the Township of Wayne ("Wayne"), as well as William Paterson University ("WPU")[1] and two of its administrators, Brian Gorski and Sandra L. Miller (collectively, the "WPU Defendants"). Brennan, who produces a local television show on a television station owned by Wayne and operated by WPU, alleges that Defendants have violated his rights under the First Amendment to the United States Constitution, the New Jersey Constitution, and the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521 et seq. (the "Cable Act"). Defendants have moved to dismiss Plaintiff's claims on a variety of grounds, while Plaintiff has moved for entry of partial summary judgment, contending that certain guidelines developed and imposed by WPU are facially invalid.

    I will deny the motions, with one exception. As a matter of law, the Cable Act bars claims for damages against a public entity like Wayne; I will therefore grant Wayne's motion to dismiss the claims insofar as they seek damages only.

**I.    FACTUAL BACKGROUND[2]**

    Plaintiff Brennan, a resident of Wayne Township, New Jersey, produces a local television program called "The New Jersey Civil Circus." (Pltf's L. Civ. R. 56.1 Statement ¶¶ 1-2; WPU Dfds' Response Statement at ¶¶ 1-2). His stated

---

    [1] Incorrectly named in the caption as William Paterson College.
    [2] I now set forth the facts essentially as agreed (or disagreed) upon in the parties' respective L. Civ. R. 56.1 Statements. Of course, for purposes of assessing the pending motions to dismiss, I will, as always, restrict my analysis to the allegations of the Second Amended Complaint and the documents it incorporates or relies upon.

purpose "is to present information to assist individuals and the general public in making informed decisions about topics including but not limited to preventing political corruption and insuring ethics in government." (Certification of Pltf. ("Brennan Cert.") [ECF No. 66-3] at ¶ 3). On the show, he interviews guests, discusses newspaper articles, and occasionally takes a humorous approach. (*Id.* at ¶¶ 4-5). There is no dispute that Brennan engages in political speech on his program. (Pltf's Statement at ¶ 15; WPU Dfds' Resp. at ¶ 15).

Defendant Wayne Township has a franchise agreement[3] with the cable-television provider known as Cablevision. It is a condition of the agreement that Cablevision provide two channels for the broadcasting of "public, educational, or governmental" programming. (Pltf's Statement at ¶ 4; WPU Dfds' Resp. ¶ 4; Wayne's Resp. Statement at ¶ 4). The two channels granted to Wayne for these purposes are channels 76 and 77. (Pltf's Statement at ¶ 6; WPU Dfds' Resp. at ¶ 6; Wayne's Resp. at ¶ 6). Wayne controls the management and operation of channel 77. (Pltf's Statement at ¶ 7; Wayne's Resp. at ¶ 7). WPU, a state university located in Wayne, controls and operates channel 76 pursuant to an agreement with Wayne. (Pltf's Statement at ¶¶ 8-10; WPU Dfds' Resp. at ¶¶ 8-10; Wayne's Resp. at ¶¶ 8-10).

Defendants Sanda L. Miller and Brian Gorski are employed by WPU. (Pltf's Statement at ¶ 11; WPU Dfds' Resp. at ¶ 11). Brennan contends, and WPU Defendants dispute, that Miller and Gorski "exercise editorial discretion in determining whether programming will be aired on public access cable television channel 76." (Pltf.'s Statement at ¶ 25; WPU Dfds' Resp. at ¶ 25). Plaintiff contends, and WPU Defendants dispute, that Gorski advised Plaintiff on October 1, 2010, that WPU refused to air "The New Jersey Civil Circus" because the show violated "general rules of conduct." (Pltf's Statement at ¶ 26; WPU Dfds' Resp. at ¶ 26). Brennan and the WPU Defendants agree, however, that Gorski advised plaintiff, via email, that "use of the word 'tit' in his program was unacceptable and further stated that mentioning a telephone number during the broadcast would 'possibly' be considered public dissemination of private information and 'possibly' constitutes a security concern." (Pltf's Statement at ¶ 27; WPU Dfds' Resp. at ¶ 27). According to Brennan, however, "'tit' was used in the show as a description of unethical politicians obtaining government benefits and payments—the 'public tit'—and was not used in a lewd or lascivious manner." (Pltf's Statement at ¶ 28). After receiving and following the above warning, Brennan submitted episode three of his program to Gorski on or about April 28, 2011, requesting its airing. (Pltf's Statement at ¶ 29; WPU Dfds' Resp. at ¶ 29). Brennan contends, and WPU Defendants deny, that he edited episode three to conform to content-based restrictions imposed by WPU and WPU nonetheless refused to air the episode. (Pltf's Statement at ¶ 31; WPU Dfds' Resp. at ¶ 31).

---

[3] The terms of which are set forth in Wayne Township Ordinance 65 (2001). (*See* Wayne Resp. Statement at ¶ 17; Certification of Joseph M. Morris III, Ex. A [ECF No. 70-1] (copy of Ordinance 65)).

2

On or about May 1, 2011, Brennan declared his candidacy for a seat in the New Jersey State Assembly. (Pltf's Statement at ¶ 30; WPU Dfds' Res. at ¶ 30). He alleges that WPU refused to air episode three of his program because it believed that Wayne Township Ordinance 23, section 5A-8 prohibited airing a program involving a political candidate. (Pltf's Statement at ¶ 31; WPU Dfds' Statement at ¶ 31). That Wayne ordinance did indeed limit use of public access channels by political candidates. (Wayne's Resp. Statement at ¶ 32). Brennan asserts that Wayne's ordinance wrongfully "regulat[es] the content of public speech in the broadcasts on the channels it operates and controls." (Pltf's Statement at ¶ 33). He also contends that the ban on candidate's participation in the production of any program is unlawful (*id.* at ¶ 34); that it has a chilling effect on speech (*id.* at ¶ 35); and that, on June 2, 2011, it was wrongfully used by WPU to deny Brennan access to Channel 76 (*id.* at ¶¶ 36-37).[4]

It is undisputed that defendant Sandra Miller, in her capacity as director of instruction and research technology, wrote to Brennan that, under the aforementioned ordinance, "[a] host/coproducer who becomes a candidate will not be permitted to have a role in the production of the program." The upshot of the letter was that "[t]herefore, we regret to inform you that we cannot air your piece." (*Id.* at ¶ 38; WPU Dfds' Resp. at ¶ 38).

Thereafter, Wayne apparently backpedaled. In an October 27, 2011 letter (10 days after this action was filed), Wayne agreed to "air the subject programming at Mr. Brennan's request." (Pltf's Statement at ¶ 40; WPU Dfds' Resp. at ¶ 40; Wayne's Resp. at ¶ 40). Brennan contends, and the WPU defendants deny, that Wayne acknowledged that section 5A-8 of the ordinance could not be used to deny him access to its public access channels. (Pltf's Statement at ¶ 39; WPU Dfds' Resp. at ¶ 39; Wayne's Resp. at ¶ 40). Brennan also contends, and the WPU defendants deny, that, given Wayne's position, WPU advised that it would air an edited version of Plaintiff's show, (Pltf's Statement at ¶ 41; WPU Dfds' Resp. at ¶ 41), but further insisted that the content of the program "compl[y] with the University's general rules of conduct," which are administered by WPU's "Cable Advisory Board." (Pltf's Statement at ¶ 42; WPU Dfds' Resp. at ¶ 42).[5]

As to WPU's "rules of conduct," Brennan complains that he was not provided any guidance and was left to guess about their contents (something WPU defendants deny). (Pltf's Statement at ¶¶ 43-44; WPU Dfds' Resp. at ¶¶ 43-44). Brennan eventually obtained[6] a copy of WPU's "Education Access &

---

[4] Strangely, this argument is only made through his Statement of Facts, and does not exist anywhere in his moving brief, which focuses only on WPU's guidelines.

[5] Brennan's papers sometimes state that WPU operates Channel 77. This is most likely a typo; the evidence is that WPU operates Channel 76, and Brennan acknowledges that in his Reply Br. at p. 1.

[6] Through an Open Public Records Act Request. (Pltf's Statement at ¶ 47; WPU Dfds' Resp. at ¶ 47). As discussed below, Brennan did not possess these documents at the time of the original complaint, which was dismissed by Judge Faith S. Hochberg.

Streaming Channel, WPTV- WPTV Operating Policies, Procedures and Guidelines," which states:

> WPTV has the right and responsibility to determine whether the programming on the station is consistent with its education mission. Any prospective programming that would limit WPTV's right to provide educational access cablecasting service or otherwise inconsistent with William Paterson's educational mission will be deemed as grounds for denial of access for that program.
>
> ...
>
> f. The Cable Advisory Board reserves the right to (1) reject content, (2) alter broadcast times, (3) limit broadcast times…, and/or (4) edit content for space limitations, clarity, and aesthetics, in the interest of good broadcasting practices and taste.
>
> ...
>
> h. For editing purposes, the Cable Advisory board reserves the right to make changes, deletions, corrections, or additions as is necessary in order to maintain reasonable standards of clarity and good taste. Content must be submitted at least (2) weeks prior to the date of your event. This allows us time to process your request.

(Pltf's Statement at ¶ 45; WPU Dfds' Resp. at ¶ 45). Brennan complains that WPU did not furnish him with this policy. (Pltf's Statement at ¶ 46). The WPU Defendants reply that he never requested it. (WPU Dfds' Resp. at ¶ 46).

Brennan, erroneously in my view, alleges that the WPTV Operating Policies, Procedures and Guidelines also state the following:

> The legislative history suggests that PEG [Public, Educational, and Governmental] channels were intended to be "the video equivalent of the speaker's soapbox or the electronic parallel to the printed leaflet. They provide groups and individuals access to electronic media with the opportunity to become sources of information through this method of communication.

(Pltf's Statement at ¶ 48 (citing Brennan Cert Ex. C)). As the WPU Defendants point out, the Policies, Procedures and Guidelines do not contain those words

4

concerning legislative history. The quotation seemingly comes from the House Report for the Cable Act of 1984. H.R. Rep. No. 98-934.

At any rate, Brennan complains that WPU's WPTV guidelines are vague (particularly in their use of a "good broadcasting practices and taste" criteria). In his view, they impermissibly give "unbridled discretion to [WPU] to reject proposed programming." (*Id.* at ¶¶ 50-51).

## II.   PENDING MOTIONS

The currently operative complaint is the Second Amended Complaint. Wayne moves under Fed. R. Civ. P. 12(b)(6) for the dismissal of Plaintiff's claims for money damages and attorney's fees, citing Section 555a(a) of the Cable Act. That section, says Wayne, bars such claims for damages against government entities, and limits plaintiff to injunctive and declaratory relief. [ECF No. 71].

The WPU Defendants, too, move for dismissal under Fed. R. Civ. P. 12(b)(6) [ECF No. 74]. They argue that the 'law of the case doctrine' requires dismissal of counts I, III, and IV, in light of a prior order of dismissal by Judge Hochberg (Br. Supp. MTD at pp. 13-16); that Count II fails to state a claim of a constitutional violation in regard to the WPU Guidelines (*see id.* at pp. 16-22); that Count V fails to state a claim of conspiracy (*see id.* at p. 22); and that the WPU Defendants enjoy sovereign immunity under the Eleventh Amendment (*see id.* at pp. 23-25).

In his motion for partial summary judgment [ECF No. 66], Brennan argues that WPU's Operating Policies, Procedures and Guidelines should be struck down as facially invalid under the First Amendment, which he says prohibits the government regulation of speech by administrators with unfettered discretion, unguided by objective criteria. A "good taste" guideline for their editorial powers thus constitutes an unlawful, unbounded prior restraint on speech, he says. (*See* Br. Supp. Mot. Summ. J. at pp. 6-10). Brennan stresses that these Guidelines also violate the Cable Act, which limits editorial control to "obscenity, indecency, or nudity." (Reply Br. at pp. 1-2).

## III.   ANALYSIS

### A. Applicable Legal Standards

Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). On such a motion, the well-pleaded factual allegations of the complaint must be taken as true, with all reasonable inferences drawn in plaintiff's favor. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A plaintiff must "provide the 'grounds' of [his] 'entitlement to relief,'" which "requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

5

(2007). Thus the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, demonstrating that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). This entails "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The standard is one of facial *plausibility*, as opposed to probability, or mere possibility. *Iqbal*, 556 U.S. at 678. Thus this Court must determine whether the allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.* at 679.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Of course, this standard does not operate in a vacuum: "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254 (1986).

### B. Motion to Dismiss the Claims for Money Damages and Attorney's Fees Against Wayne Only

The Second Amended Complaint contains five counts, alleging various violations of the First Amendment and equivalent New Jersey constitutional violations, in addition to a conspiracy claim. Its prayer for relief requests some seven different injunctions or declarations from the Court, in addition to compensatory damages, punitive (or "exemplary") damages, and costs and

6

attorney's fees pursuant to, *inter alia*, 42 U.S.C. § 1988. Wayne argues that Brennan cannot legally recover compensatory, punitive, or attorney's fees from Wayne, a governmental entity.

The Cable Television Consumer Protection and Competition Act of 1992 (the "Cable Act"), which amended the Cable Act of 1984 (which itself modified the Communications Act of 1934), provides that:

> In any court proceeding...involving any claim against a franchising authority <u>or other governmental entity</u>, or any official, member, employee, or agent of such authority or entity, <u>arising from the regulation of cable service</u> or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, <u>any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief</u>.

47 U.S.C. § 555a(a) (emphasis added).

This is an issue of law potentially suitable for resolution on a motion to dismiss. "[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *E.g., Sebelius v. Cloer*, 133 S. Ct. 1886, 1896 (U.S. 2013) (Sotomayor, J.) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank*, N.A., 530 U.S. 1, 6 (2000) (Scalia, J.)).

It appears that at least two Courts of Appeals have found that the plain language of the Cable Act precludes the award of money damages, and potentially attorney's fees too, in a suit that asserts violations of the Constitution and the Cable Act arising from the regulation of cable television. *See Coplin v. Fairfield Pub. Access TV Comm.*, 111 F.3d 1395, 1407 (8th Cir. 1997) (finding that Section 555a "limits [plaintiff's] potential recovery in this action [based on alleged First Amendment violations and brought pursuant to 42 U.S.C. § 1983] to declaratory and injunctive relief," and that "we need not interpret the legislative history of the Cable Act because its statutory language is clear"); *Jones Intercable v. City of Chula Vista*, 80 F.3d 320, 324-325 (9th Cir. 1996) (affirming district court's finding that Section 555a(a) precludes money damages, though not speaking directly to attorney's fees; *cf. Edwards v. Armstrong*, 1995 U.S. App. LEXIS 16545 (6th Cir. June 30, 1995) (finding that the "straightforward, encompassing and imperative language of § 555a" bars constitutional and Cable Act claims to the extent that they seek money damages, though leaving open that attorney's fees might be recoverable). One district court has explicitly held that the Cable Act bars attorney's fees, even those ordinarily recoverable under 42 U.S.C. § 1988. *Cable TV Fund 14-A v. City of Naperville*, 1997 U.S. Dist. LEXIS 7336 at Part III.A.6 (N.D. Ill. May 21, 1997) (granting motion to dismiss to the extent Plaintiff's Section 1983 claim alleging constitutional violations in the city's refusal to allow a channel to be

7

operated without a city-wide franchise and seeking remedies other than injunctive and declaratory relief).

Neither the Third Circuit nor this Court has addressed this issue under Section 555a. The District Court for the Middle District of Pennsylvania seemingly stands alone in this Circuit in holding that, "[i]n accordance with 47 U.S.C. § 555a(a), Plaintiff is only permitted to receive injunctive and declaratory relief." *Serv. Elec. Cablevision, Inc. v. City of Hazleton*, 462 F. Supp. 2d 616, 620 (M.D. Pa. 2005). The statute, however, and the case law are clear.[7]

*Coplin* is instructive. There, a local access talk show aired material that appeared to mix political content with material regarded by some as indecent. *See* 111 F.3d at 1395-1400. The Eighth Circuit, although reversing on other grounds, affirmed the lower court's *sua sponte* determination that plaintiff would not be entitled to receive money damages and attorney's fees. *Id.* at 1407-1408. Section 555a(a), the court held, "limits Coplin's potential recovery in this action to declaratory and injunctive relief, [such that] Coplin's allegations that he is entitled to monetary damages and attorney's fees fail to state a claim upon which relief may be granted." *Id.* at 1407.

*Coplin* also made it clear that Section 555a(a) applies generally to disputes over cable service, irrespective of the particular cause of action: "At the heart of Coplin's action is a dispute over the regulation of cable service: he brings an action disputing a governmental entity's right to regulate the content carried on a public access cable service. As a result, Coplin's action arises from the regulation of cable service within the meaning of § 555a(a)." *Id.* at 1408; *see also McClellan v. Cablevision of Conn.*, 149 F.3d 161, 168 n. 15 (2d Cir. 1998); *Caprotti v. Town of Woodstock*, 94 N.Y.2d 73, 75-79 (1999).

Brennan does not cite any case law to the contrary. He does cite civil rights statutes that explicitly authorize recovery of damages and attorney's fees. (*See* Br. Opp. Wayne's Mot. to Dismiss. at 26-29 (citing, *e.g.*, N.J.S.A. §§ 10:6-1(c), (d), (f); 42 U.S.C. § 1988)). But a Congress that possesses the power to confer such a right of recovery can also limit it or take it away. Section

---

[7] Given the clear wording of the statute, I do not believe that resort to legislative history is necessary or appropriate. I nevertheless note that *Jones Intercable* and *Cable TV Fund 14-A* also found that the legislative history accorded with their interpretation of Section 555a. In particular, the Northern District of Illinois noted that the Senate's version of the 1992 amendments to the Cable Act exempted "local franchising authorities from liability for damages (*except attorney's fees and legal costs*) in cases where the franchise authorities are charged with violating a cable operator's First Amendment rights," but that this version was rejected in favor of the House's version, which contained no such carve-out for attorney's fees and costs. *Cable TV Fund 14-A*, 1997 U.S. Dist. LEXIS 7336 at Part III.A.6 ("Thus, an examination of the legislative history of Section 555a(a) further supports the conclusion that attorney's fees may not be collected by a successful Section 1983 plaintiff"); H. R. CONF. REP. No. 102-862, 102d Cong., 2d Sess. (1992), 1992 WL 231584 at *98-99 (Joint Explanatory Statement of the Committee of Conference).

555a(a) expressly acknowledges that the damages remedies it de-authorizes are those which would otherwise be "required by any other provision of Federal, State or local law." 47 U.S.C. § 555a(a).

Brennan's other arguments that damages claims are authorized do not convince. For example, he generally cites principles of "strict construction" or the necessity of a clear legislative statement, but these bromides do not neutralize the plain language of the statute. Brennan also attempts to distinguish *Coplin*, *McClellan*, and *Cable TV Fund 14-A*, arguing that they did not involve State constitutional law claims. Section 555a, however, limits recovery under "any other provision of Federal, *State, or local* law." 47 U.S.C. § 555a(a) (emphasis added). Brennan also points out that some of those earlier cases were disputes between municipalities and cable operators (rather than content producers). Section 555a(a) explicitly applies to cases in which a government entity is the defendant; it does not distinguish between kinds of plaintiffs. *See Coplin,* 111 F.2d at 1407-8.

I hold that Brennan cannot assert a valid claim against Wayne for compensatory, punitive, and exemplary damages. Those components of Brennan's claims against Wayne are hereby dismissed. As to Wayne, a government entity, Brennan is authorized to seek only injunctive and declaratory relief.

There remains the issue of attorney's fees. Brennan cites Supreme Court case law holding generally that the 42 U.S.C. § 1988 fee provision applies even to public officials who are immune from monetary damages. *See Pulliam v. Allen*, 466 U.S. 522 (1984). In *Pulliam*, the Supreme Court found that "[t]he legislative history of [Section 1988] confirms Congress' intent that an attorney's fee award be available even when damages would be barred or limited by "'immunity doctrines and special defenses, available only to public officials.'" *Id.* at 543 (quoting H. R. Rep. No. 94-1558, p. 9 (1976)).

Here, I am hampered by Wayne's failure to respond to Brennan's argument. It is very possible, of course, that Section 555a(a) carved out an exception to the earlier attorney's fees provisions of the Civil Rights Acts. The cases cited above suggest as much. But because Brennan here sets up a legitimate clash between Section 555a(a) and Section 1988 (as interpreted by the Supreme Court), there is at least a colorable issue. The issue of attorney's fees, however, need not be addressed at all unless Brennan prevails. I will therefore reserve decision and leave intact, for now, the prayer for attorney's fees.

To sum up, Wayne's motion to dismiss is GRANTED as a matter of law, but only to the following extent: all claims against Wayne, to the extent they seek monetary damages, are dismissed. The motion is otherwise DENIED.

9

### C. WPU Defendants' Motion to Dismiss

#### 1. Counts I, III, and IV: "Law of the Case"

The WPU Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) first asserts that the 'law of the case doctrine' requires dismissal of Counts I, III, and IV of the Second Amended Complaint. I disagree.

Plaintiff filed this action in October 2011. [ECF No. 1]. The WPU Defendants moved to dismiss the original complaint. On March 27, 2012, District Judge Faith S. Hochberg, to whom the case was then assigned, granted the motion and dismissed the then-pending claims against the WPU Defendants. [ECF No. 26]. She denied a motion for reconsideration of that order. [ECF No. 31]. Plaintiff sought leave to appeal, contending that Judge Hochberg should have found that the television channels were "designated public fora where strict scrutiny is applicable to defendants' regulation of [his] speech," and that, regardless of forum type, she should have found that WPU's guidelines constituted an unlawful prior restraint, in that they granted unbridled discretion to channel regulators. [ECF No. 34-1 at pp. 5-6]. That motion was rendered moot when, with Wayne's consent, Plaintiff was granted leave to file an amended complaint. [*See* ECF Nos. 42, 43, 45, 53]. The currently pending motions are directed to the Second Amended Complaint.

Judge Hochberg dismissed the original complaint against the WPU Defendants because "Plaintiff fails to plead a cognizable claim under the First Amendment and Plaintiff cannot establish a claim against it under the Cable Act." Judge Hochberg reasoned that WPU, an educational institution, is a "limited public forum" that may reasonably impose viewpoint-neutral restrictions on speech in keeping with its educational purpose. She further held that the university is not a cable operator as defined by the Cable Act. Or rather, she held, based on the allegations of the original complaint, that no such case had been made out. (*See* 3/27/12 Order [ECF No. 26]). That dismissal was necessarily without prejudice, because Judge Hochberg granted leave to amend the complaint.

The WPU Defendants contend that current Counts I, III, and IV must be dismissed for the same reasons that the original Counts I, II, and III were dismissed by Judge Hochberg.

As to Count I, I reject this contention at the outset. Count I of the Second Amended Complaint is directed solely at Wayne's ordinance, and Wayne has not moved to dismiss it. Judge Hochberg's earlier dismissal was based on the WPU Defendants' motion, and it does not control the current issues as to Wayne.

Counts III and IV of the Second Amended Complaint, however, are concededly parallel to counts that Judge Hochberg dismissed. Count III (like Count II of the original complaint) asserts a broad claim that the defendants'

10

acts of content-based censorship violated the United States and New Jersey constitutions, as well as the Cable Act. Count IV (like Count III of the original complaint) alleges defendants' acts of censorship and denial of access to the television channels violated the free speech provisions of the New Jersey Constitution. As to these, I address the law of the case doctrine.

The law of the case doctrine is a set of rules "developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." Wright, Miller & Cooper, Federal Practice and Procedure Jurisdiction 2d § 4478, at 637-638. "As rules that govern within a single action...they regulate judicial affairs before final judgment." *Id.* at 639-641 (distinguishing the doctrine from res judicata). They do, however, apply only to matters actually decided, explicitly or by "necessary implication." *Id.* at n. 19 (citing *Quern v. Jordan*, 440 U.S. 332, 348 (1979)); *AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, 104 F.3d 601, 605 (3d Cir. 1997).[8]

It has been held that the law of the case doctrine should be applied under the following "extraordinary circumstances": "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Public Interest Research Group v. Magnesium Elektron*, 123 F.3d 111, 117 (3d Cir. 1997). A court, however, retains broad discretion. "So long as the same case remains alive, there is power to alter or revoke earlier rulings." Wright, Miller & Cooper, *supra*, at 637, 667-68; *see also Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.) ("[T]he phrase, law of the case, as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.").

The "extraordinary circumstance" rule has been perpetuated in decisions where courts *declined* to depart from the law of the case. *See* Wright, Miller & Cooper, *supra*, § 4478, at 670-672. One suspects that such a court is not really saying that it erred, but that such error does not rise to the required level. No court would willingly cling to error merely for the sake of consistency. "There is a particularly strong tendency to 'get it right' during all trial-court proceedings before the first final trial-court judgment," and sometimes "[e]ven after the first final judgment." *Id.* at 672. And that power to place one's own house in order extends to a case in which a successor judge has occasion to revisit a predecessor judge's rulings in a transferred case. *See* Wright, Miller & Cooper,

---

[8] I deal here with the aspect of the doctrine known as the coordinate jurisdiction rule, which provides that "a court should not ordinarily reconsider issues already decided by a court of coordinate jurisdiction." Anne Bowen Poulin, *Prosecution Use of Estoppel and Related Doctrines in Criminal Cases: Promoting Consistency, Tolerating Inconsistency*, 64 Rutgers L. Rev. 409, 421-422 (2012). The coordinate jurisdiction rule is a matter of discretion. In that respect, it is to be distinguished from the "mandate rule"—a trial court's rigid obligation on remand to abide by the legal determinations of a court of appeals.

11

*supra*, § 4478.1, at 711-712 n. 39 (citing *In re United States*, 733 F.2d 10, 13 (2d Cir. 1984) (holding, in the context of a successor judge's partial reinstatement of a dismissed third party complaint, that "[i]t is well established that the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge")).

I do not think the law of the case doctrine would appropriately dictate a result here. First, there is new evidence (in this context I mean, of course, new allegations). I have before me WPU's WPTV Operating Policies, Procedures and Guidelines (*see* Second Amended Complaint [ECF No. 65] at ¶¶ 63-69). These WPU Guidelines were not placed before Judge Hochberg. I face for the first time the issue of whether those regulations are facially void as improper regulations on content, or as a prior restraint (*see id.* at ¶¶ 67, 69, 88-99). The context is now different, and I believe Judge Hochberg's legal holding that WPU is a limited public forum and an educational institution for free speech purposes should be reviewed afresh. To take one example: Judge Hochberg's finding that the "WPU Defendants' restriction on the content of Plaintiff's program was reasonable" obviously must be revisited, because Judge Hochberg was not asked to consider WPU's WPTV Guidelines, which are clearly the source and substance of the "restriction" being employed by the WPU Defendants. In short, the question of the facial validity of WPU's WPTV Operating Policies, Procedures and Guidelines" is presented here for the first time.

As I say, the Guidelines alter the factual context. They also may alter the legal context. I find the First Amendment question of what kind of forum William Paterson University is to be a difficult one. *See, e.g., Denver Area Educational Telecom. Consort. v. FCC*, 518 U.S. 727, 780-792 (1996). There, Justice Kennedy, concurring in part, stated that public access channels "are a designated public forum of unlimited character." *Id.* at 791-92. In such a forum, content-restrictive regulations must be "narrowly drawn to achieve a compelling state interest.'" *Id.* at 794. Justice Breyer's plurality opinion took a slightly different approach, avoiding forum labeling altogether. *Id.* at 759-760. Various lower courts have differently stressed the plurality or concurring approaches, but have tended to treat public access channels as public forums entitled to a high degree of speech protection.

Forum analysis, however, is highly fact-sensitive. The ultimate result may depend, for example, on whether the government, when it delegated operation of the channel to WPU, intended it to be limited to certain groups and topics. *See also* Part D, *infra.* In short, I believe that factual development could undermine Judge Hochberg's limited holding, which was based on a more limited set of claims and allegations that the Plaintiff placed before her.

At any rate, Counts III and IV of the Second Amended Complaint, in their present form, adequately set forth a plausible claim irrespective of whether WPU cable station is a limited public forum. Brennan offers specific factual

12

allegations concerning the WPU Defendants' alleged refusals to air his political discussion show, relying on both their own guidelines and on a Wayne township ordinance. (*See* Second Amended Complaint at ¶¶ 43, 48-49). I, unlike Judge Hochberg, have before me allegations regarding *both* the WPU Guidelines and the Wayne ordinance. On their face, these regulations are plausibly alleged to open the door to viewpoint regulation and to grant WPU the right to reject or edit producer content without any objective criteria. (*See id.* at ¶¶ 50, 63). Brennan alleges that the channel is an unlimited designated public forum because Wayne obtained the channels from Cablevision for purposes of providing *public* access, and that Wayne thereafter entered into an agreement with WPU for the operation of one of those channels on a similarly unlimited basis. (*Id.* at ¶¶ 36-40, 18-20). But the Complaint, in its Second Amended form, also contains corroborating indications that WPTV is, at least in WPU's mind, an educational-only channel. (*See* id. at ¶ 63). That issue cannot be resolved here; I hold only that the allegations are sufficient to state a claim.

I shall therefore **DENY** the WPU Defendants' motion to dismiss Counts I, III and IV.

### 2. *Count II*

WPU Defendants next move to dismiss Count II of the Second Amended Complaint based on their contention that WPU's WPTV Policies, Procedures, and Guidelines "are not unconstitutional." That is not exactly the issue upon a 12(b)(6) motion. Rather, I need to assess whether the second count of Plaintiff's Second Amended Complaint sets forth a plausible constitutional claim.

Count II alleges that all Defendants' regulations "are unconstitutional because they are not content neutral, are unconstitutionally vague, and constitute a prior restraint." Defendants, it alleges, "seek to control editorial and advocacy content [] in practice and through their adopted policies. This censorship is content based and void on its face." (Second Amended Complaint ¶ 89).

With respect to the WPU Defendants, Plaintiff alleges that Ms. Miller and Mr. Gorski, as employees of WPU in charge of WPTV, "exercise editorial discretion in determining whether programming will be aired on Wayne Township's public access channel 77." (Probably a reference to Channel 76 was intended.) In doing so they acted pursuant to WPU's WPTV's Policies, Procedures, and Guidelines, as well as the Township of Wayne's Ordinance 5A-8. (*See id.* at ¶¶ 42, 43, 49, 50, 56, 60).

WPU's WPTV Policies, Procedures, and Guidelines state, in pertinent part, that a six-person "Cable Advisory Board reserves the right to (1) reject content...and/or (4) edit content for space limitations, clarity, and aesthetics, in the interest of good broadcasting practices and taste." (*Id.* at ¶ 63). It further provides that "For editing purposes, the Cable Advisory Board reserves the right to make changes, deletions, corrections, or additions are is necessary in

13

order to maintain reasonable standards of clarity and good taste. Content must be submitted at least (2) weeks prior to the date of your event. This allows us time to process your request." (*Id.*). Finally, it provides "There is no prohibition to airing programming involving politicians or political issues if those programs are of an educational nature consistent with the educational mission of William Paterson and these guidelines." (*See* WPTV Guidelines (Ex. C to Cert. of Pltf in Supp. Of Mot. Part. Summ. J. [ECF No. 66-3])).

A parallel ordinance of the Township of Wayne provides that a "host/coproducer who becomes a candidate will not be permitted to have a role in the production of the program." (*See* Second Amended Complaint ¶¶ 49, 55-56). "Candidate" may plausibly be interpreted to mean a candidate for political office.

Finally, the Complaint alleges that WPTV is a public access channel that WPTV operates on behalf of the Township of Wayne, which received the channel via a franchise from Cablevision pursuant to the Cable Act of 1984. (*Id.* at ¶¶ 19, 36-40).

The Second Amended Complaint has set forth a plausible claim that Defendants' regulations impermissibly permit regulation of speech without adequate standards. That, of course, is not the end of the story. Defendants may develop a factual record that will influence the Court's view of the nature of the forum (to the extent this may be material under the law), the interests at stake, and the "fit" between the regulation and those interests. Thus, I shall **DENY** the motion to dismiss Count II.

### 3. Count V: Conspiracy

WPU Defendants next contend that Plaintiff's Count V, alleging a conspiracy among all of the Defendants, must be dismissed for failure to state a claim. (*See* Br. Supp. Mot. to Dismiss at 22-23).

"'A conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law' [i]s actionable." *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990), cert. denied 499 U.S. 976 (1991). "[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) (citing *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1377 (3d Cir. 1992) and *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008) (stating that a conspiracy requires a "meeting of the minds")). "This holding remains good law following *Twombly* and *Iqbal*, which, in the conspiracy context, require 'enough factual matter (taken as true) to suggest that an agreement was made,' in other words, 'plausible grounds to infer an agreement.'" *Id.* (quoting *Twombly*, 550 U.S. 544, 556).

The operating agreement by which WPU obtained control of Channel 76 (alleged generally in Second Amended Complaint at ¶ 19) provides context. For example, Wayne allegedly "has the authority and power to direct [WPU] to alter, amend and/or eliminate its unconstitutional regulation of Public, Educational, and Governmental cable television stations," and "to direct [WPU] to cease engaging in conduct that violates the Constitution…" (Second Amended Complaint at ¶¶ 104-105). Even the very existence of Wayne's ordinance, described above, implies a potential agreement between Wayne and WPU.

Other allegations relate more specifically to relevant events. The Complaint alleges, for example, that the WPU Defendants claimed to be enforcing Wayne's ordinance in taking the stance that an episode produced while Brennan was running for public office would be barred. (*Id.* at ¶¶ 49, 55-56). Again, coordination with Wayne might be inferred.

I will **DENY** the motion to dismiss Count V.

### 4. *WPU Defendants: Sovereign Immunity*

The WPU Defendants also argue that they, as a state entity and its employees acting in their official capacities, enjoy Eleventh Amendment immunity from claims brought by an individual in federal court. (Br. Supp. Mot. Dismiss at 23-25).

The threshold issue is whether WPU, a public university, is a state entity for Eleventh Amendment purposes. This "is a fact-intensive review that calls for individualized determinations." *Bowers v. NCAA*, 475 F.3d 524, 546 (3d Cir. 2007). Although the facts as to different universities may differ, it is instructive that, as to two major institutions in the State system, the federal courts have found that immunity does not apply. *See Kovats v. Rutgers, State University*, 822 F.2d 1303, 1312 (3d Cir. 1987) (Rutgers); *Bostanci v. N.J. City Univ.*, 2010 U.S. Dist. LEXIS 126693, *2-3 (D.N.J. Dec. 1, 2010) (New Jersey City University). *But see Nannay v. Rowan College*, 101 F. Supp. 2d 272 (D.N.J. 2000) (sovereign immunity applied to Rowan College at summary judgment stage).

The Third Circuit has "adopted a three-part test to apply in order to determine whether an entity is an arm of the state for Eleventh Amendment purposes. That test examines the following three elements: (1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Id.* at 546; *see also Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989). Questions of Eleventh Amendment immunity are for the court to decide. *Bostanci, supra,* 2010 U.S. Dist. LEXIS 126693 at *2-3 (citing *Skehan v. State System of Higher Education*, 815 F.2d 244, 246 (3d Cir. 1987)). The burden of setting forth facts proving entitlement to immunity is borne by the party asserting such immunity, *id.* at *3 (citing *Christy v. Pennsylvania Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995)).

15

The first "question at issue is 'whether a money judgment against a state instrumentality or official would be enforceable against the State.'" *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430 (1997). The appropriate underlying inquiry "is whether the State is obligated to pay or reimburse the University for its debts." *Bowers*, 475 F.3d at 547. In *Bostanci*, for example, this Court found that New Jersey City University "failed to show that the State of New Jersey bears an obligation to pay a judgment against it[,]" noting that, under state statutes pertaining to state universities generally, a university's board of trustees may borrow money from the state, but such borrowing would not constitute a debt of the State. *See Bostanci* at *5 (citing N.J.S.A. § 18A:64-6(t)).

Here, the WPU Defendants do not even really contend that the State of New Jersey is obligated to reimburse WPU's debts, *e.g.*, money judgments. Their naked assertion that because WPU is "a public institution of higher education...any payment of damages will come from the State" seems more like a prediction. (Reply Br. Supp. Mot. to Dismiss at 7-8). The case law cited above implies that there is no such State obligation merely by virtue of the fact that defendant is a public educational institution. More facts are necessary.

The second question asks "whether the State itself considers the entity an arm of the state. Under the second factor, we look to how state law treats the entity generally; whether the entity can sue or be sued in its own right, whether the entity is separately incorporated, and whether the entity is immune from state taxation." *Bowers*, 475 F.3d at 548. Here, WPU Defendants say next to nothing on this point, except to say that its "board of trustees, the governing body of the university, is appointed by the Governor with the advice and consent of the Senate." (Reply Br. in Supp. of Mot. to Dismiss at 8 (citing N.J.S.A. 18A:64-3)). That is not a sufficient showing. *See also Bostanci, supra,* at *7-9 ("the State of New Jersey views NJCU as an affiliated but autonomous entity, and not as an arm of the State").

The third factor concerns the extent of the institution's autonomy. The WPU Defendants offer little or nothing on that point. *See id.* at *10 ("the New Jersey legislature has put considerable effort into increasing the autonomy of the state colleges over the past 25 years").

"'[E]ach state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances.'" *Kovats*, 822 F.2d at 1312 (quoting *Soni v. Board of Trustees of the University of Tennessee*, 513 F.2d 347, 352 (6th Cir. 1975)); *see also Bowers* at 524, 548-49 (finding University of Iowa entitled to immunity give the high level of state control of its finances and operation). At this stage, WPU has not remotely met its burden of setting forth sufficient facts to demonstrate an entitlement to sovereign immunity. As to WPU, the issue might be revisited at the summary judgment stage, but at present I cannot grant a motion to dismiss on Eleventh Amendment grounds.

16

Because WPU has not established sovereign immunity, such immunity cannot be extended to Gorski and Miller. *See Kovats v. Rutgers, State University*, 822 F.2d 1303, 1306 (3d Cir. 1987) ("Any Eleventh Amendment immunity granted the official bodies or the officers would be derivative from the immunity of Rutgers itself, []and, therefore, if Rutgers is not entitled to Eleventh Amendment immunity, neither are its official bodies and its officers in their official capacities." (citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101-02 (1984))).

Accordingly, the WPU Defendants' motion to dismiss on Eleventh Amendment sovereign immunity grounds is **DENIED**.

### D. Plaintiff's Motion for Partial Summary Judgment

Brennan seeks partial summary judgment declaring that WPU's WPTV Policies, Procedures and Guidelines (the "Guidelines") are facially invalid under the First Amendment and under the Cable Act.

The Guidelines, Brennan argues, "grant unbridled discretion to officials charged with the administration of law regulating speech to consider the content of the speech before allowing it," and are therefore "unconstitutional and must be declared invalid." (Br. Supp. Mot. Part. Summ. J. at 10). To a great degree—though not completely—Brennan's arguments hinge on his contention that WPTV is a designated public forum, and that the Guidelines would therefore have to be narrowly tailored to further a compelling government interest.[9]

I believe that this motion for partial summary judgment, while discovery is ongoing, is premature. The issues raised therein as to the characterization of the WPU station as a public forum, the interests at stake, the nature of Wayne's delegation of authority to WPU, and so on, are factually sensitive. I will not resolve them without the benefit of a full record. In particular, I am reluctant to accept plaintiff's invitation to resolve a single issue in isolation from the others.

The parties are directed to complete discovery and then to bring whatever summary judgment motions they believe appropriate, all at once as to all issues appropriately so presented. That is this Court's usual practice and I will not depart from it here.

Plaintiff Brennan's motion for partial summary judgment will therefore be administratively terminated by the clerk, without prejudice to reassertion at the proper time.

---

[9] Relying on the Cable Act, Brennan also contends that WPU's editorial control must be limited only to "obscenity, indecency, or nudity." (Reply Br. at pp. 1-2). Plaintiff cites 47 U.S.C. § 532(c)(2), though it would appear that he meant to cite § 531(e), which limits regulation of "any public, educational, or governmental use of channel capacity."

## CONCLUSION

For the reasons stated above, Wayne's motion to dismiss is **GRANTED IN PART** in that the demands for compensatory, punitive, and exemplary damages against it are **DISMISSED WITH PREJUDICE**. Wayne's motion to dismiss is otherwise **DENIED**. The WPU Defendants' motion to dismiss is **DENIED**. Finally, Plaintiff's motion for partial summary judgment is **ADMINISTRATIVELY TERMINATED** and may be reasserted at the proper time.

_____
HON. KEVIN MCNULTY
United States District Judge

Dated: July 23, 2014
Newark, New Jersey